# EXHIBIT A

# AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter of the Arbitration between: | ) AAA Case No. 01-22-0002-2850 |
| | ) |
| Pravati Investment Fund IV, LP, | ) |
| | ) |
| Claimant, | )                    FINAL AWARD |
| | ) |
| -and- | ) |
| | ) |
| Balestriere PLLC and John G. Balestriere, | ) |
| | ) |
| Respondents. | ) |
| ——————————————— | ) |
| | ) |
| Balestriere PLLC | ) |
| | ) |
| Counter-Claimant, | ) |
| | ) |
| -and- | ) |
| | ) |
| Pravati Investment Fund IV, LP and | ) |
| Pravati Capital LLC, | ) |
| | ) |
| Counter-Respondents. | ) |
| | ) |
| | ) |

## Procedural Background

1.      This arbitration proceeding involves a dispute over litigation funding provided by claimant Pravati Investment Fund IV, LP ("PF") to respondent Balestriere PLLC, a New York-based law firm that does business under the name Balestriere Fariello ("BF").

2.      Respondent John G. Balestierre ("JB") is the owner of BF. Counter-respondent Pravati Capital LLC ("PC") is the manager of Fund IV.  In this order, consistent with the usage of the parties, PF and PC are sometimes referred to collectively as "Pravati."

3.     At the evidentiary hearing in this matter, PF and PC were represented by Benjamin Pierce; BF and JB were represented by Matthew Schmidt and John G. Balestriere.

4.     On May 31, 2022, PF filed a demand for arbitration with the American Arbitration Association.  The demand stated the dispute involved breach of contract, breach of the implied covenant, fraud, conversion, and, in the alternative, unjust enrichment.  The demand identified the claim amount as $11,614.019.84 and also requested attorney's fees, costs, and interest.

5.     On June 21, 2022, BF and JB filed a response and BF filed counterclaims against PF and PC.  PF and PC did not file an answering statement or reply to the counterclaims.

6.     On July 14, 2022, the Arbitrator held a preliminary hearing and scheduling conference with the parties.  Based on that hearing, the Arbitrator issued Scheduling Order No. 1, which noted that no party objects to the Arbitrator's jurisdiction over the claims asserted in the proceeding, the Federal Arbitration Act applies, and the 2020 agreement identified in the demand for arbitration states that the proceeding shall be governed by the substantive law of the state of Arizona.  This order set a two-day evidentiary hearing to begin on August 31, 2022.

7.     At the request of the parties, and to allow them opportunities to explore a possible resolution, the hearing date was vacated and related deadlines were suspended.

8.     On July 10, 2023, the Arbitrator held another preliminary hearing and scheduling conference with the parties, which resulted in Scheduling Order No. 2, entered on July 15, 2023.  That order set a three-day evidentiary hearing to commence on December 4, 2023, and identified pre-hearing deadlines.  It restated the language from Scheduling Order No. 1 regarding the Arbitrator's jurisdiction over the claims asserted, the application of the Federal Arbitration Act,

and the application of the substantive law of Arizona. This order set a September 15, 2023 deadline for the parties to amend their claims or counterclaims.

9. After a status conference on November 10, 2023, the Arbitrator allowed the parties to submit supplemental briefs on the party status of PC, as its counsel argued that it was not properly a party. On November 16, 2023, the Arbitrator ruled that PC is a party to this arbitration and had waived any objection to jurisdiction based on its participation in these proceedings over the previous 16 months. PC noted its continuing objection to its party status.

10. On November 15, 2023, Claimant/counter-respondents moved for a sixty day continuance of the arbitration schedule. Respondents/counter-claimant filed a response opposing the request. On November 17, 2023, the Arbitrator denied the continuance.

11. On November 20, 2023, another telephonic hearing was held with the parties, resulting in Scheduling Order No. 3, which set the hearing for December 18-20, 2023. With the agreement of the parties, the evidentiary hearing was later rescheduled to commence on December 20, 2023.

12. On December 7, 2023, the Arbitrator and respondents/counter-claimant received Pravati's Motion for Prejudgment Attachment and Appointment of a Monitor dated November 29, 2023. Respondents/counter-claimant filed a response on December 14, 2023, and the Arbitrator denied the motion on December 15, 2023.

13. The arbitration provision in the 2019 Agreement and the 2020 Agreement provides as follows:

All claims presented for arbitration shall be particularly identified and the Parties to

the arbitration shall each prepare a statement of their position with recommended courses of action. These statements of position and recommended courses of action shall be submitted to the arbitrator. The arbitrator shall not be empowered to make decisions beyond the scope of the position papers.

14.     The parties filed their respective statements of position ("SOP") on December 5, 2023.  The statement filed by PF and PC is referenced as "PSOP" and the statement filed by BF and JB is referenced as "BSOP".

15.     In its SOP, PF asserts claims for breach of contract, fraud, breach of the implied covenant of good faith and fair dealing, conversion, and, in the alternative, unjust enrichment, claiming, among other things, that BF hid fees it received, practiced law through multiple entities, made deceitful statements in its case updates, and otherwise concealed information. PF claims damages in excess of $15 million.  PF also seeks to hold JB liable as the guarantor of the obligations of BF and requests an award of punitive damages.

16.     In its SOP, BF denies any fraud or breach of contract.  BF argues that the 2020 agreement on which PF is suing was fraudulently procured and PF itself breached that agreement by spring 2021, relieving BF of its obligations to perform.  BF contends that a 2019 agreement is the operative one and it has complied with that agreement.  JB contends that even if BF were liable, he is not liable under the guaranty because PF did not comply with the required procedures.

17.     In its SOP, BF also asserts counterclaims against PF and PC.  It alleges that PF and PC breached the 2019 and 2020 Agreements and breached the implied covenant of good faith and fair dealing; that PF and PC were unjustly enriched; that PF and PC tortiously interfered with BF's business relationships; and that PF and PC intentionally or negligently fraudulently induced BF

to enter the 2020 Agreement. BF requests declaratory relief that the 2020 Agreement is unenforceable, that PF's claims are unripe because there have been no recoveries under the operative agreement, and that BF has met its contractual obligations. BF also requests an award of compensatory damages of at least $5,486,852.10, punitive damages for the fraudulent inducement and tortious interference claims, and an award of attorney's fees and costs.

18.    A three-day evidentiary hearing was held in Phoenix, Arizona, on December 20-22, 2023. Live testimony was given by Ivan Mora, Alexander Chucri, Richard Terry Keefe IV (by video-conferencing), John G. Balestriere, and Ian Abaie.

19.    The hearing was not completed on December 22, 2023. Instead, the parties each submitted post-hearing briefs, along with proposed findings of fact and conclusions of law, on January 19, 2024. The parties then submitted response briefs on January 26, 2024. This briefing completed the evidentiary hearing. As provided in paragraph 19 of Scheduling Order No. 2, the Arbitrator issued an interim award on February 21, 2024. After the parties were allowed to submit briefing on the calculation of the award amount and the request for attorney's fees, this final award was entered on March 5, 2024.

Findings of Fact

20.    The following findings include the Arbitrator's determinations on disputed facts where the testimony of one or more witnesses may have been conflicting. A finding that implicitly credits the testimony of one witness does not imply that other witnesses knowingly testified inaccurately, but instead simply reflects the Arbitrator's determination of which testimony was more credible in light of all the evidence presented on a particular disputed fact.

21.    PC manages investment funds, including PF, that provide litigation funding for law firms in exchange for an interest in the law firm's fee recoveries, e.g., a percentage of all contingent fee proceeds.  The funds are repaid their investment plus interest from the recoveries, if any.  Before providing litigation funding, PC conducts due diligence, including reviewing electronic case file information available for federal and state courts, and it also monitors cases with such information.  After receiving funding, a law firm like BF provides PC monthly reports on pending cases and copies of the firm's monthly bank statements.

22.    BF obtained litigation funding from an entity called Counsel Financial II LLC in 2007.  A dispute arose between BF and Counsel Financial, and the latter sued Balestriere in 2014 seeking to recover $1.4 million allegedly owed and submitting with its complaint a "confession to judgment" that JB had signed in April 2012 acknowledging a debt of $1.7 million. *Counsel Financial II LLC v. Balestriere,* 151505/2014 (N.Y. County).  This dispute was settled, and BF repaid the amounts owed to Counsel Financial by 2016.

23.    JB was initially contacted by former Pravati employee Hoyt Neal in 2018 about Pravati possibly providing litigation funding for the case identified by the parties as *Lawson v. Rubin*, which BF is pursuing on a contingent fee basis for six victims of sex trafficking.

24.    The evidence does not show that BF and JB misrepresented or concealed the *Counsel Financial* litigation in communications with Pravati.  Pravati has not presented evidence that BF or PG were asked about such prior litigation before Pravati began making loans to BF.

25.    Pravati first provided non-recourse funding to BF on March 12, 2018, in the net amount of $300,000 for *Rubin.*  The funding was provided by Pravati Credit Fund III LP, another

fund managed by PC.  As part of the funding, Pravati held back an additional $369,000 as an "Interest Reserve."  BF obtained a plaintiffs' verdict in April 2022 but has not received a contingency fee payment and post-trial motions are still pending.

26.     In a matter referred to as *Balestriere Fariello v Diaz Rivera*, on March 18, 2018, JB transferred $1.4 million in funds that had been wired to BF's trust account and applied them to amounts owed to the firm.  This case concerns claims by BF for attorney's fees, including a success fee, from multiple parties, some of whom are in Mexico.  The case is also sometimes referred to as *Cargill*, *Farallon*, or *Desarollos Inmobiliarios Del Pedregal* ("*DIPSA*"), as the different names reflect parties in the underlying matter for which BF was seeking fees.  One of parties was Jonathan Bernstein, who in December 2018 brought claims against BF and JB contesting the fee recovery and the March 2018 transfer of funds.

27.     In April 2018, summary judgment briefing was completed in the U.S. District Court in the *Reply All* case.  The case had been filed in 2015 and BF took over as plaintiff's counsel on a contingent fee basis in 2017.

28.     JB met with Alexander Chucri ("Chucri"), the chief executive officer of PC, in New York on August 15, 2018.  They discussed the prospect of PF providing litigation funding to BF on a portfolio basis, i.e. funding to be repaid from the firm's entire portfolio of contingent fee cases rather than funding for a single case.  JB and Chucri gave conflicting testimony whether *Counsel Financial* was discussed at this meeting.

29.     BF and Pravati Credit Fund III entered into a second single case funding agreement for $1.25 million on August 27, 2018, under similar terms to the first funding. This funding

agreement was for the *Diaz Rivera* or *Farallon* case. BF described this case to Pravati as a fee dispute in which it was suing third parties for failing to pay legal fees and it valued the case at $15.6 million fully litigated or $14.6 million if settled.

30.    On December 31, 2018, Jonathan Bernstein and White Lilly LLC sued BF and JB in the United States District Court for the Southern District of New York contending, among other things, that JB had improperly transferred the $1.4 million from its trust account in March 2018. In the complaint, White Lilly LLC described itself as a litigation funder in which Bernstein was an investor; Bernstein denied that he had been a client of BF. The complaint alleged, among other things, fraud and conversion and sought not only the complete forfeiture of BF's fees (including any success fee) but also compensatory and punitive damages.

31.    BF and Pravati Credit Fund III entered into another funding agreement in January 2019. The parties agreed to a funding of $500,000 initially, and up to $3,000,000 subject to written approval by all parties. The funds were disbursed in tranches over the next year. With each tranche, the parties entered a supplemental funding agreement in which BF acknowledged the outstanding debt.

32.    The January 2019 agreement was different from the first two fundings. This agreement was for "Portfolio Funding," meaning the collateral for Pravati's loan was a portfolio of BF's contingent cases, including any future cases. Exhibit A identified the law firm's existing cases, including *Rubin*, *Chug*, *Diaz Rivera,* and *Reply All*. The 2019 Agreement did not require payment to PF from BF's receipt of hourly fees.

33.    The January 2019 agreement acknowledged that Pravati had provided total funds

to-date of $4,006,100 and an additional $3,000,000 was approved for funding, of which $500,000 would immediately be wired. The remaining $2.5 million was to be distributed in tranches as long as there was no material breach by BF.

34. On February 4, 2019, JB sent Hoyt Neal a monthly case update. With regard to the *Diaz Rivera* case, the update noted that Bernstein had filed a lawsuit in federal court and provided the case number. The update did not describe Bernstein's claims but noted that the court had denied his requests for injunctive relief and the matter would proceed in arbitration, which BF had initiated.

35. BF and JB did not misrepresent or conceal the lawsuit filed on December 31, 2018, by Bernstein and White Lilly.

36. In November 2019, the firm won the *Chugh* contingent fee case at trial. Judgment was entered in March 2020, and the Connecticut Supreme Court affirmed most portions of that judgment in April 2022. BF has not yet recovered a contingent fee in that matter.

37. In February 2020, the U.S. District Court entered summary judgment dismissing the *Reply All* complaint. On March 2, 2020, BF noted in its monthly case update to PF that it had lost on summary judgment and was discussing options with the client.

38. The last tranche pursuant to the January 2019 agreement was in the amount of $250,000 and was disbursed on March 27, 2020. The full $3,000,000 funding commitment from the January 2019 agreement was completed on this date. For each distribution under the January 2019 agreement, BF and JB personally represented and warranted, among other things, that no default existed, and no default had occurred under the previous funding agreement since its

execution.

39. In the spring of 2020, BF obtained two contingency fee settlements and paid PF approximately $500,000 from the fee receipts in those matters.

40. BF and PF executed an Omnibus Legal Funding Contract and Security Agreement on September 17, 2020 (the "2020 Agreement"). This Agreement acknowledges that BF then owed PF $6,942,908.11 and by its terms supersedes the parties' earlier agreements. Pravati understood that cases were being delayed due to COVID, that BF was tight on capital, and the firm needed "somewhat of a bridge during the slow times."

41. Under the 2020 Agreement, PF provided an additional $500,000 in funding in September 2020. The 2020 Agreement contemplated additional funding of up to another $2,000,000:

> The Net Advance Amount for this Term Sheet is $500,000.00. The Net Advance Amount may only be increased by mutual written consent of Pravati and Law Firm, up to another $2,000,000.00. Law Firm will not be eligible for an increase in the Net Advance Amount unless and until Law Firm and Pravati both agree that Law Firm has retained or will retain new cases reasonably projected to generate Proceeds to Law Firm valued at no less than $10,000,000.00.

42. Unlike the earlier agreements, the 2020 Agreement required BF to pay PF a share of fees from hourly fee matters. The agreement defines "Proceeds" to include "all money or other things of value that Law Firm hereafter recovers." Fifty percent of Proceeds from contingent cases and 20 percent of Proceeds from hourly cases were to be paid to PF, subject to increased payments in the event of a default or certain reductions in expected contingent recoveries.

43. Pravati had a first-lien position in the firm's "Portfolio of Cases" and all future cases

or related proceedings.  The firm's existing cases included *Bernstein* (as part of *Diaz Rivera*) and *Reply All* (in which an appeal was pending from the U.S. District Court's grant of summary judgment).

44.     The 2020 Agreement defines a "Material Adverse Litigation Development" or "MALD" as:

> any holding, order, judgment, or ruling by a court, tribunal, forum, agency, arbitrator or other authority that Pravati determines (acting in good faith and in a commercially reasonable manner) is likely to have a material adverse effect on the collectability of Proceeds or the likelihood of recovering Proceeds.

45.     Upon the occurrence of a MALD, PF is to receive 100% of Proceeds until BF pays down its outstanding obligation by the value of the Proceeds anticipated from the cases subject to the MALD.

46.     The 2020 Agreement identifies various events of default in clause 2(e), including non-disclosure or concealment by Balestriere "regarding any Case or Proceeds or any other material information about [BF] or any of its members, managers, or lawyers" (clause 2(e)(i)); a failure by BF to timely remit to PF its share of Proceeds received (clause 2(e)(iv)(b)); entry of a judgment of $75,000 or more against BF or its members or managers or the Guarantor (clause 2(e)(vi)); a finding by a court of competent jurisdiction that BF or any of its members or managers or the Guarantor has engaged in any fraudulent or deceitful activity (clause 2(e)(xii)(b)); uncured breaches of the agreement (clause 2(e)(xiii)); and the "[b]reach of any warranty contained in this Agreement" by BF or JB (the Guarantor) or "any inaccuracy or omission as to any representation or statement in this Agreement or in any report in connection herewith by the Law Firm or

Guarantor" (clause 2(e)(xiv)).

47.     Under clause 15 of the 2020 Agreement, BF and JB (as the Guarantor) represent, among other things, that "as of the date of this Agreement . . . the portfolio of Cases and other Related Proceedings are meritorious and valued reasonably in good faith . . . and BF "has not (and will not) received any money or anything else of value or entered into an undisclosed agreement or taken any action that would diminish the value of the Cases."

48.     The 2020 Agreement also requires BF to deposit proceeds from recoveries into the client trust account, report on the current status and development of cases since the last month's report, and to notify PF if it was discharged from any case or proceeding.  Failure to comply with these requirements for more than 30 days is a default event.

49.     The 2020 Agreement provides that in the event of default, 100% of all of Balestriere's revenue will be owed to Pravati until the outstanding debt is repaid.  During the occurrence of a default, amounts owed to Pravati accrue interest at the rate of 6% per annum in excess of the rates otherwise applicable.  A default also can trigger obligations by JB under a Limited Guarantee Agreement entered on September 17, 2020, concurrently with the 2020 Agreement.

50.     The term sheet accompanying the 2020 Agreement has this provision:

> Non-Waiver: Neither a failure nor a delay by Pravati in exercising any right, power or privilege under this Term Sheet shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege. The rights, remedies and benefits of Pravati herein expressly specified are cumulative and not exhaustive of any other rights, remedies or benefits which Pravati may have had at law, in equity, by statute or otherwise.

51.     Prior to the entry of the 2020 Agreement, PF and PC did not falsely represent that Pravati had sufficient capital to fully fund its obligations under the Agreement and that PF would maintain an "interest reserve" to protect BF.  PF and PC did in fact have sufficient capital in 2020 and 2021 to fully fund obligations under the 2020 Agreement, and PF did maintain an interest reserve consistent with that Agreement.

52.     JB testified that BF would not have entered the 2020 Agreement if it did not believe it would receive the full $2.5 million in additional funding and that BF acted in reliance on PF's promises of additional funding by hiring additional staff.

53.     The 2020 Agreement did not by its terms require PF to provide $2.5 million of additional funding.  The parties did not modify the 2020 Agreement, either orally or in writing, after the agreement was executed.  The language of the 2020 Agreement indicates that the "$10,000,000 new cases" requirement was a condition for eligibility for additional funding, but did not itself create a right to such funding.  Any reliance by JB or BF on a perceived "promise" by PF to provide additional funding if BF identified new cases with a value of $10 million was not reasonable given the terms of the 2020 Agreement and the communications from Pravati to BF.

54.     In connection with the 2020 Agreement and in the parties' later dealings, Pravati did not promise BF that it would provide further funding at a time when Pravati knew or should have known it was not able or did not intend to provide such funds.

55.     In a November 6, 2020 letter, JB advised Pravati of some new matters, including a prospective ERISA action against Prudential Financial, Inc.  JB noted that a similar class action

against MetLife resulted in a fee award to counsel of more than $20 million based on an $80 million settlement, and stated "We expect a similar, if not higher, settlement from an ERISA suit against Prudential."

56.     On December 4, 2020, BF sent its monthly case update for November 2020. The report included success fee cases. With regards to *Reply All*, the report noted that a separate firm was handling the client's appeal and that the defendant's fee application was pending in the trial court. In a separate letter from JB, BF sent a revenue projection and a report on hourly proceeds, noting Pravati's share of the fees received.

57.     BF requested additional funding under the 2020 Agreement at the end of 2020. BF maintained that it had met the threshold for additional funding by December 2020 when it obtained the prospective *Prudential* class action. PF responded that BF had not met the threshold for additional funding, noting that BF had not identified a client for the *Prudential* matter. PF nonetheless provided another $250,000 under a First Supplemental Funding Agreement executed on December 17, 2020.

58.     The First Supplemental Funding Agreement contained a provision explicitly stating BF had not met the minimum threshold for further discretionary funding. By signing this agreement, BF acknowledged this provision, the validity and binding nature of the 2020 Agreement, and its outstanding debt as $7,892,865.69. Pravati wired the additional $250,000 to BF shortly after the execution of the First Supplemental Funding Agreement.

59.     In an email to JB on February 22, 2021, Chucri noted that BF had requested an additional $750,000 in funding and stated that Pravati would not fulfill this request. He further

stated that there had been MALDs in several cases: *Dhue, Verlaine*, *Nguyen*, *WordLogic*, *MT Packaging*, *Reply All*, and *It's Just Lunch*. This email further stated that pursuant to the 2020 Agreement, the MALD entitled Pravati to 100% of all contingent fee proceeds and that '[c]ommencing on May 21, 2021, we will ratchet collection of hourly proceeds to 100%." Chucri added that Pravati would introduce JB to a broker to "help to transition your firm to a larger funder that has more capacity than we do."

60. In a February 23, 2021 email, JB responded by noting that the identified events for the cases other than *Dhue* all predated the 2020 Agreement and that while a claim in the *Dhue* arbitration had more recently been dismissed, that prospect had been discussed with Pravati and the case was a "tiny percentage of the value of our overall portfolio."

61. On March 2, 2021, Chucri sent an email to JB stating that if BF missed its stated value for a case by 20%, that was a material adverse change. In the same email, Chucri again stated that Pravati was "not willing to provide any additional funds at this time," and offered to assist BF in identifying other funders to pay off Pravati and add $2–5 million in additional funding. On March 5, 2021, BF sent Pravati the case update for February 2021. That update noted that in *Reply All*, the court of appeals on February 12 had affirmed the granting of summary judgment for the defendant.

62. PF provided another $250,000 in funding in a Second Supplemental Funding Agreement executed on March 18, 2021. In this agreement, BF acknowledged that the outstanding debt was $8,558,066.65 and that it had not met the threshold performance requirements to be considered for further funding. BF also reaffirmed that the representations and

warranties contained in the 2020 Agreement were true and correct as of March 18, 2021, as though made on that date.

63.     On April 5, 2021, BF sent Pravati the case update for March 2021.  That update noted that the client in *Reply All* had not yet decided whether it wished to proceed with new actions.

64.     On April 5, 2021, the U.S. District Court in *Reply All* ruled that the case was meritless from the beginning and had been pursued in bad faith and accordingly awarded $1.4 million in fees against BF and against JB and Matthew Schmidt personally.  The U.S. District Court observed that "Plaintiff's counsel proceeded in bad faith by bringing objectively unreasonable and frivolous claims … and by attempting to extort a nuisance settlement form Defendant by advancing unsubstantiated and legally incognizable damage theories."

65.     The U.S. District Court's April 2021 ruling does not establish that BF or its attorneys intentionally misrepresented or concealed information about the merits of the *Reply All* case in communications with PF prior to the fee award.  Prior to the adverse ruling on the motion for summary judgment, JB had engaged in preliminary settlement discussions in the $1 million range.  BF and Pravati recognized that intellectual property litigation is difficult and the outcome of the summary judgment motion was uncertain.  The April 2021 ruling was, however, material information about the case, BF, and its lawyers.

66.     On May 5, 2021, BF sent Pravati the case update for April 2021.  BF did not report the U.S. District Court's fee award in *Reply All* in the monthly update that BF submitted to PF in May 2021 or thereafter.

67.     JB testified that he learned in April 2021 in a phone conversation with Dai Wai Chin Feman, who worked for a litigation funder named Parebellum, that a broker had revealed confidential information about BF.  On June 28, 2021, Feman forwarded to JB an email exchange between Parebellum and Tony Verum at Verum Partners.  The email exchange began on February 3, 2021.  In the exchange, Verum asked if Parebellum worked with brokers and stated that the lawyers were looking for $5 million.  He sent Parebellum a "case matrix" for BF, which included assessments of individual cases.  Parebellum told Verum it was not interested.  At the hearing, JB said the information in the matrix had only been provided to Pravati.

68.     Both the 2020 Agreement and 2019 Agreement had confidentiality provisions. They required each party to hold confidential information in strict confidence and to safeguard such information with a reasonable degree of care.  Pravati was allowed to share confidential information "with potential assignees to whom Pravati may assign its rights and obligations under this Agreement, where such information is reasonably necessary to allow a potential assignee to make an informed decision whether to take assignment from Pravati, provided that Pravati enters into an appropriate confidentiality agreement with any such potential assignee."

69.     At the hearing, JB stated that the disclosure of confidential information was a material breach of the 2020 Agreement because it could have disclosed BF's analysis of its cases to its adversaries and it risked causing significant harm to BF's clients.  JB did not, however, identify any particular matter in which BF or its clients had been harmed by the disclosure.

70.     The evidence does not show that Pravati disclosed the "case matrix" to Verum or otherwise improperly disclosed BF's confidential information.  No one from Pravati is on the

email exchange between Verum and Parebellum. Chucri and Mora each testified that Pravati did not disclose BF's confidential information. BF did not show that it had previously transmitted the "case matrix" sent by Vellum to Pravati.

71.     BF did not prove any non-speculative damages resulting from the alleged disclosure of confidential information.

72.     In May 2021, BF asked Pravati to advance the remaining $2 million under the 2020 Agreement. On May 4, 2021, Hoyt Neal sent JB a text stating that Ivan Mora thought Pravati was "prepping" for an additional tranche and was "like 75% sure." Pravati, however, refused to provide additional funding, reaffirming its earlier position that BF had not met the minimum threshold for further discretionary funding. BF contended it had met the threshold because by May 2021 it had identified clients for the *Prudential* matter.

73.     Pravati did not unreasonably or wrongfully exercise its discretion in declining to provide additional funding under the 2020 Agreement.

74.     In a June 19, 2021 email to JB, Chucri stated that BF had "triggered a default" related to the "MAC" Clause. Chucri apparently was referring to the MALD clause in the 2020 Agreement.

75.     At the hearing, Chucri testified that he understood the MALD clause as providing that when there is a "significant change in value in the law firm's portfolio, Pravati has a right to collect more dollars than it's owed on subsequent cases so we could be pari passu with the firm." This statement comports with the terms of the 2020 Agreement, which in the event of a MALD gives Pravati a right to 100% of Proceeds until BF has paid down the outstanding obligation by

an amount corresponding to the value of Proceeds anticipated from the cases subject to the MALD.

76.     On June 22, 2021, PF sent BF a notice of material default demanding immediate payment of $9,502,115.75.  PF separately sent JB a "Demand to Guarantor" demanding immediate payment of the same amount under the Limited Guarantee Agreement.  Each letter stated that BF was in material default under section 2(e) of the 2020 Agreement, and specifically noted: (1) due to Material Adverse Litigation Developments, BF was required to remit 100% of all Proceeds to Pravati, and its June 4, 2021, case report reflected that it had received fees in May of at least $45,634.58 and had remitted only $5,812.98; (2) BF had defaulted by not disclosing that it had previously been sued by Counsel Financial and by misrepresenting that the firm was new to litigation funding; (3) the firm had given up or abandoned cases that Pravati had funded without obtaining Pravati's written consent; and (4) BF had not maintained adequate key man insurance. The letters observed "[o]ther Defaults under the Agreement may also exist."

77.     At the hearing, PF's former senior legal counsel Ian Abaie said PF sent this notice of default after it thought BF had stopped paying PF from hourly fee proceeds and because it thought the BF had received more than $1 million in the *Silver Sands* matter.  Chucri also said the notice was sent because of the firm's receipt of funds in the *Silver Sands* matter.  In fact, BF had not by then stopped paying PF from hourly fee proceeds.  The deposits in *Silver Sands* did not occur until April 2022, and the firm provided information about those deposits when asked by Pravati in May 2022.

78.     After a telephone call with Chucri, Hoyt Neal, and Ian Abaie on June 22, 2021, JB

sent Chucri an email the next day. JB there stated that he understood Pravati was no longer in a position to wait for proceeds to be realized from BF's contingent fee matters, as Pravati was closing out the fund and returning money to investors, and that Pravati had stated its willingness to work with BF in finding replacement funders. JB said BF was not in default and was reserving all rights.

79.     Chucri did not respond to JB's email and Pravati did not otherwise express agreement with the email's assertions. In subsequent communications, neither side agreed with the others' position with regard to whether BF was in default, and each side reaffirmed at various times that it was reserving its rights.

80.     BF was in fact in default under the 2020 Agreement as of June 21, 2021, because the U.S. District Court in the *Reply All* case had ruled on April 5, 2021, that the case was meritless from the outset and BF did not report on the case in its monthly case updates or otherwise.

81.     PF also sent lien letters in June 2021 to counsel in cases in which BF was participating. The 2020 Agreement did not specifically refer to lien letters, but it did give PF a first lien in Proceeds from all of BF's cases.

82.     PF did not violate the terms of the 2020 Agreement or deny BF any reasonably expected benefits of that agreement by sending the default notice on June 21, 2021, or by concurrently sending lien letters to counsel in cases in which BF was participating. BF also did not identify any non-speculative damages that resulted from PF's issuing the lien letters.

83.     On July 21, 2021, the arbitrator in the *Bernstein* matter entered an award that, among other things, awarded BF its unpaid discounted fees and costs in the amount of nearly $1,000,000

and allowed BF to keep the $1.4 million that had been transferred in March 2018, but ruled that BF had forfeited its success fee of $8.4 million because JB had improperly transferred funds from the trust account to pay fees owed.

84.     The arbitrator in *Bernstein* concluded that JB had engaged in conduct that was deceitful and "highly inappropriate" by transferring the funds after the clients had explicitly told him not to do so and JB had misleadingly replied that he would not violate his ethical duties.  The arbitrator acknowledged that JB may have subjectively believed he was entitled to take the money to pay unpaid fees, but noted that this did not obviate the ethical violation.  The arbitrator dismissed the various counterclaims, including those for fraud and conversion, and rejected Bernstein's request for treble damages in addition to forfeiture of the success fee.

85.     On August 4, 2021, BF reported on *Bernstein* in its monthly case update to PF by stating BF "proved its claim for an account stated and its claim for breach of contract against Bernstein to the extent of its unpaid, discounted legal fees and costs" and been awarded $925,975.67, plus another $59,041.99 for Bernstein's breach of the arbitration clause. This statement accurately described the amount awarded, which was plainly less than the more than $9 million fees BF had sought in the arbitration.  The update did not state that the arbitrator had ruled that the success fee was forfeited due to JB's improper and deceitful transfer of funds.

86.     After the June 2021 notice of default, BF continued to provide monthly case updates for its success fee cases and bank statements to PF and to provide other information when requested.  In August 2021, Ivan Mora sent emails to BF asking about the remittal of hourly fees and again stating that Pravati was entitled to 100% of all recoveries based on the MALD clause.

The firm sent Pravati $5,067.29 related to BF's hourly recoveries. On August 30, 2021, JB sent Mora an e-mail stating that no MALD had occurred and that the firm would send another payment in September.

87.     After September 2021, BF stopped remitting to PF a portion of the fees earned from hourly fee cases. At the hearing, JB explained that BF did so after it concluded that PF had itself breached the 2020 Agreement and the agreement was unenforceable and the 2019 Agreement instead remained in effect. JB, however, testified that he only first communicated this position to Pravati in discussions with Ian Abaie in May 2022. Abaie denied that JB or others at BF had told him this.

88.     PF did not object when BF stopped remitting a share of fees from hourly cases. PF benefitted by not objecting because requiring BF to pay over a share of its hourly fees would have made the firm's financial condition – and PF's potential recovery from future contingent fees – more precarious.

89.     On November 15, 2021, JB participated in a zoom call with Abaie and Chucri. At the hearing, JB stated that he then discussed the *Bernstein* and *Prudential* matters. Chucri and Abaie denied that JB told them about the basis for the adverse arbitration award.

90.     On November 19, 2021, the complaint in *Stone v. Prudential Financial* was dismissed without prejudice. BF did not report the dismissal in its monthly case update to PF.

91.     When PF in a December 15, 2021 email questioned the omission of the *Prudential* dismissal from the case report, JB responded in a January 5, 2022 email that the dismissal was not a material event because, among other things, it concerned one client and another complaint could

be filed.  On January 10, 2022, BF filed a stipulation for dismissal with prejudice in *Stone v. Prudential Financial.*

92.    BF did not report the dismissal with prejudice in the *Prudential* case when it submitted its monthly update on February 2, 2022.  At the hearing, Abaie testified that BF never informed Pravati of the dismissal of the *Prudential* case.

93.    In January 2022, BF sent an email to PF stating that it intends to bring within the statute of limitations claims against other parties in the *Farallon* case including individuals Juan Diaz Rivera and Leticia Diaz Rivera, as well as a Mexican real estate company owned by the Diaz Riveras called DIPSA.  At the hearing, JB testified that a lack of resources has prevented BF from pursuing these claims or seeking to collect the approximately $1 million awarded against Berstein in the arbitration.

94.    As noted above, in April 2022, BF obtained a jury verdict in the *Rubin* case and the Connecticut Supreme Court affirmed BF's trial court victory in the *Chugh* case.  That same month, one of BF's possible contingent fee matters, the *Silver Sands RICO* case was largely terminated, based on statute of limitations concerns, by the filing of a stipulation for dismissal, and BF, acting as an escrow agent on behalf of its *Silver Sands* clients, received millions of dollars into its account for the clients.  None of the amounts received by BF were contingent fees, although the firm did receive hourly fees from its *Silver Sands* clients of $100,000 to $200,000.

95.    BF did not pay PF any portion of the hourly fees it received after September 2021, including such fees in the *Silver Sands* and *Stubbs* cases.

96.    After receiving BF's bank statements for April 2022, PF in May 2022 questioned

certain deposits, apparently believing the firm had received a contingent fee. BF explained the receipts related to *Silver Sands* and, with the clients' permission, provided the escrow agreement to PF.

97. PF initiated this arbitration by filing its demand against BF and JB on May 31, 2022.

98. In this arbitration, to allow the parties an opportunity to resolve their disputes, the Arbitrator vacated an evidentiary hearing set for August 2022 and suspended various pre-hearing deadlines until the entry of Scheduling Order No. 2 on July 15, 2023.

99. On September 21, 2022, the U.S. District Court confirmed the arbitrator's award in *Bernstein*. In confirming the award, the U.S. District Court denied BF's request to modify the award to set aside the forfeiture of the $8.4 million success fee. The U.S. District Court noted the arbitrator "repeatedly stated that Balestriere's conduct, regardless of his subjective intent, was unethical and violative of Rule 1.15(a) of the New York Rules of Professional Conduct." Ordering the fee forfeiture, the U.S. District Court concluded, was within the arbitrator's power and there was "no reason to question the arbitrator's judgment."

100. On October 6, 2022, BF informed PF in its monthly case report of the confirmation, simply noting that the District Judge "confirmed the arbitration award."

101. On February 24, 2023, Ian Abaie sent a letter from PC to JB and Matthew Schmidt outlining next steps with regard to BF's capitalization and account structure. Among other things, the letter noted that "Pravati will work out the amount owed by extending time for BF to litigate its cases, gain more momentum and acquire new cases. Pravati acknowledges that BF was significantly impacted for multiple years by COVID-19 pandemic." Pravati stated it would assist

in anyway it can" with BF's "discussions and negotiations with future funders and investors." Abaie added that "Pravati's rights, interests, positions, and accruals are not modified, including but not limited to those contained or based in the proprietary and confidential Omnibus Law Firm Legal Funding Contract & Security Agreement," and stated that BF should continue providing case status updates, individual case reports, and financials.

102.    On March 30, 2023, Alex Chucri sent a letter to JB to "facilitate our helpful dialogue in transitioning this account to another funding entity and/or to fund your matters along with Pravati Capital." The letter noted that COVID had delayed recoveries for the firm, and stated that "We believe you have a very promising portfolio and over the years your firm has achieved significant successes, including with several recent jury trial and appellate court victories." Like the February letter from Abaie, this letter reaffirmed Pravati's interest in helping BF identify another litigation funder. It also asked BF to continue providing case status updates, individual case reports, and bank statements.

103.    The February 2023 letter from Abaie and the March 2023 letter from Chucri were sent after JB had requested and drafted an earlier letter. They were sent to help BF in its efforts to identify an alternative litigation funder as a way to resolve the parties' disputes in this arbitration.

104.    BF continued to provide Pravati case status reports and bank reports on a monthly basis. The evidence did not show that BF has received any contingent fee recoveries since spring 2020, when it paid PF $500,000 from such recoveries as provided in the 2019 Agreement. BF has not received funding from any litigation funder other than Pravati since entering the 2019

Agreement, which recognized, by creating an exception for Pravati's first lien position, that another funder had provided funds for the *It's Just Lunch* case.

105. Pravati did not prove that BF and JB intentionally misrepresented the viability, value, and statuses of the cases that served as collateral for the loans from PF. Pravati did not prove that BF and JB hid case proceeds from Pravati through the use of alternative entities and improper transfers between its general account and its client trust accounts.

106. The payoff amount for BG's outstanding obligation to PF was $9,502,115.75 as of June 22, 2021. According to the testimony of Ivan Mora, the payoff amount was $15,200,801.66 as of December 5, 2023.

Conclusions of Law

*A.    The Enforceability of the 2020 Agreement*

107. In its SOP, BF alleges that Pravati "intentionally—or, at least, negligently— fraudulently induced the Firm into entering into the September 2020 Agreement by falsely representing that the Pravati Parties had sufficient capital to fully fund its obligations under the September 2020 Agreement, and that it maintained an "interest reserve" to protect the Firm and as proof of its financial strength." (BSOP 19.)

108. BF requests a declaration that the September 2020 Agreement is invalid as procured by fraud and actual damages in the amount of $2,075,501.30 for its payments on the non-recourse loan amount, which it contends it was not obliged to make. (BSOP 21-22.) BF also asks that the 2020 Agreement be rescinded based on Pravati's fraudulent conduct. (BSOP 29-30.)

109. BF also alleges fraudulent inducement as an affirmative defense. (BSOP 25.)

110.    The elements of fraudulent representation are (1) a representation that is (2) false and (3) material, with (4) the speaker's knowledge of its falsity, (5) the speaker's intent that the representation be relied on, (6) the hearer's ignorance of the falsity and (7) reliance on the statement's truth, along with (8) the right to rely on the statement and (9) damages. *Carrel v. Lux*, 101 Ariz. 430, 434 (Ariz. 1966).

111.    The elements of negligent misrepresentation are (1) the respondent provided false information (2) on which it intended the claimant to rely or knew that it would reasonably rely, (3) the respondent failed to exercise reasonable care in obtaining or communicating the false information, (4) the claimant justifiably relied on the false information, and (5) damages. *KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 236 Ariz. 326, 332 (App. 2014).

112.    Claims of fraudulent inducement, intentional or negligent, must be proved by clear and convincing evidence. *Love v. Home Transp. Co.*, 131 Ariz. 394, 397 (App. 1981).

113.    BF has not proved fraudulent inducement because it has not shown that Pravati made false representations as alleged or that it justifiably relied on such statements.

114.    Insofar as BF suggested in its post-hearing briefing that it might be entitled to relief based on a claim of mistake, the Arbitrator notes that this claim was not advanced in BF's SOP, and thus cannot afford a ground for relief, and in any event BF has not proved such a claim.

115.    BF has failed to prove its counterclaim for fraudulent inducement regarding the 2020 Agreement and shall take nothing for that claim. BF has failed to prove its affirmative defense based on fraudulent inducement. BF has not shown a right to rescind the 2020 Agreement based on fraud or other misconduct by Pravati.

116.    The 2020 Agreement is enforceable and remains in effect.  The 2020 Agreement supersedes the parties' previous agreements.

B.    *Claims by PF*

B.1    *PF's Claims for Breach of the 2020 Agreement*

117.    In its SOP, PF argues that BF has materially breached the 2020 Agreement and is in default, entitling PF to 100% of BF's revenue and default interest until the debt is repaid.  (PSOP 8-9.)

118.    The elements for a claim of breach of contract are: (1) the existence of contract; (2) its breach; and (3) resulting damages.  *First Am. Title Ins. Co. v. Johnson Bank*, 239 Ariz. 348, 353 (Ariz. 2016).

a. *Alleged breaches related to Bernstein*

119.     In its SOP, PF alleges eight defaults with respect to the *Bernstein* case, arguing that: (1) BF intentionally misrepresented the value of the case to secure new rounds of financing starting in August 27, 2018, and no later than December 31, 2018, when White Lilly and Bernstein filed suit; (2) BF did not properly report the arbitrator's July 23, 2021, award that forfeited the $8.4 million success fee; and (3) BF did not properly report the U.S. District Court's order on September 22, 2022, confirming the arbitration award and ruling that the forfeiture was warranted because JB had violated the New York rules of professional conduct.  (PSOP 11-13.)

120.    PF has not shown that BF defaulted under Clause 15 of the 2020 agreement by representing that it had not taken money from the case prior to funding.  This clause does not apply to the $1.4 million transferred in March 2018 to pay fees then owed, which were not part of

the additional fees BF was seeking to recover from the arbitration that was still pending in September 2020, and in which BF was asserting the transfer was proper.

121.    PF has not shown that BF defaulted under clause 2(j) (Material Adverse Litigation Development) when it was sued by White Lilly/Bernstein on December 31, 2018; when the arbitration award issued in July 2021; or when the U.S. District Court affirmed the award in September 2022.  Contrary to BF's position, the MALD provision does not refer to the value of the Portfolio of Cases overall, but instead refers, as clause 4 of the 2020 Agreement provides, to the "value of Proceeds from *those Cases* subject to the [MALD]" (emphasis added).

122.    *Bernstein* was part of litigation more broadly referred to by the parties as *Balestriere Fariello v Diaz Rivera* or *Balestriere Fariello v Farallon*.  After the arbitration award, BF still had claims remaining against parties other than Bernstein, and Pravati has not shown that the loss of the claim for success fees against Bernstein was likely to have a material adverse effect on the collectability or likelihood of recovering Proceeds in the *Diaz Rivera* or *Farallon* cases.

123.    PF has not shown that BF defaulted under clause 2(e)(iii) by the March 2018 transfer of funds, as the Arbitrator does not interpret that clause to refer to an event antedating the entry of the August 2018 funding agreement between the parties.

124.    PF has not shown that BF defaulted under clause 2(e)(vi) by not reporting a judgment of over $75,000.

125.    PF has not shown that BF defaulted under clause 2(e)(i) based on the December 31, 2018 filing of a suit by Bernstein and White Lilly.

126.    PF has shown that BF defaulted under clause 2(e)(i) and 2(e)(xiv) by not disclosing

in its August 2021 case update that the arbitrator had determined that BF would forfeit its $8.4 million success fee because JB had improperly and deceitfully transferred funds from BF's trust account to pay fees owed to BF.

127.    PF has also shown that BF defaulted under clauses 2(e)(xiii) and 2(e)(xiv) and clause 6 by not accurately reporting the District Court's affirmation of the arbitration award.

128.    PF has not shown that BF defaulted under clause 2(e)(xii)(b) based on the arbitrator's July 23, 2021 award or the U.S. District Court's confirmation of the arbitration award. Although the Arbitrator found JB engaged in deceitful activity (not fraudulent), that finding was not by a "court" and the U.S. District Court did not find such activity in confirming the award.

###### b. Alleged breaches related to Reply All

129.    In its SOP, PF alleges seven defaults with respect to the *Reply All* case, arguing that: (1) BF used the *Reply All* case as collateral for the 2019 Agreement and the 2020 Agreement without disclosing, as the U.S. District Court later determined, that it was meritless; (2) BF did not later report the April 5, 2021 fee award against it, JB, and Matthew Schmidt in the next monthly update, or thereafter; and (3) another litigation funder, Legalist, was involved in the case. (PSOP 13-14.)

130.    PF has shown that BF defaulted under clause 2(e)(xiv) and clause 15 of the 2020 agreement because it inaccurately represented that the *Reply All* case was meritorious.  This conclusion does not presume BF's lawyers subjectively knew the case lacked merit when the 2020 Agreement was entered, but instead reflects that the inaccuracy of the representation was established by the U.S. District Court's determination in April 2021 that the case was meritless

from the outset.

131.    PF has also shown that BF defaulted under clauses 2(e)(i) and 2(e)(xiv) and clause 6 by not reporting the April 2021 fee award.  The Arbitrator rejects the arguments by BF that its failure to report was not a default because the court of appeals in February 2021 had affirmed the granting of summary judgment for the defendants.

132.    PF has not shown a breach or default under clause 2(e)(viii) or clause 3 or otherwise with respect to the litigation funder Legalist.

133.    PF has not shown a breach or default under clause 2(e)(vi)) for failing to report a judgment or under clause 2(j) (Material Adverse Litigation Development) with respect to the *Reply All* case.

### c. Alleged breaches related to Prudential

134.    In its SOP, PF alleges five defaults with respect to the *Prudential* case, arguing that: (1) BF failed to report that the case was dismissed without prejudice on November 19, 2021; (2) when PF discovered the dismissal and asked PF about it, JB in a January 5, 2022 email argued that it was not a material event because the case could be refiled; and (3) BF then stipulated to a dismissal with prejudice on January 10, 2022, and did not report the dismissal in its next monthly report or thereafter.

135.    PF has not shown that BF defaulted under clause 2(j) (Material Adverse Litigation Development) with regard to the November dismissal of the complaint in *Stone v. Prudential Financial, Inc.*, 2:21-cv-14610 (D. N.J. 2021), or the dismissal with prejudice in January 2022. The dismissals concerned a complaint by one potential class plaintiff, do not preclude the filing

of a lawsuit by other plaintiffs, and were noted on the U.S. District Court's docket. Pravati has not shown that the dismissal with regard to the one prospective class plaintiff was likely to have a material adverse effect on the collectability or likelihood of recovering Proceeds in the *Prudential* matter.

136. PF has shown that BF defaulted under 2(e)(i) (non-disclosure or concealment) by not disclosing the January 2022 dismissal with prejudice.

137. PF has shown that BF defaulted under clauses under 2(e)(xiii) and 2(e)(xiv) and clause 6 by not reporting the January 2022 dismissal with prejudice.

*d. Alleged breaches related to Silver Sands and Stubbs*

138. In its SOP, PF alleges that BF engaged in "fraud and unethical conduct" with regard to its escrow account with regard to the *Silver Sands* and *Stubbs* cases, but its more specific allegations are that BF was "paid $671,756 for serving as [an] escrow agent" in *Silver Sands* and received some $425,000 in fees in *Stubbs,* and it failed to remit Pravati its share of the fees received. (PSOP 16-17.)

139. PF has not shown a breach with regard to *Silver Sands* and the $671,756, as the identified sum was received for the client and disbursed to other law firms. BF did provide information, including a copy of the escrow agreement, to PF regarding this matter.

140. Insofar as PF complains that BF failed to pay PF from proceeds of hourly fee matters after the summer of 2021, the Arbitrator concludes that PF has waived the right to recover such fees by its knowledge and acquiescence in their non-payment. The same conclusion applies to BF's reporting of hourly fee matters once it began excluding them from its monthly reports.

141.    The waiver finding is not based on either the February 24, 2023 letter from Ian Abaie or the March 30, 2023 letter from Alex Chucri. Those letters affirmed Pravati's willingness to help BF identify an alternative funder to replace Pravati's. They did not themselves constitute a waiver of any rights of PF under the 2020 Agreement.

142.    The waiver instead results from PF's actions in not otherwise contesting BF's non-payment of fees related to hourly cases. PF notes that there is a non-waiver provision in the term sheet incorporated in the 2020 Agreement. The waiver provision in the term sheet does not preclude waiver because PF itself benefitted by not seeking payment from hourly fees as that would have made BF's financial situation (and PF's ultimate repayment) even more precarious. *See IMH Special Asset NT 168, LLC v. Aperion Communities, LLLP*, 2016 WL 7439001, at *6 (Ariz. App. Oct. 17, 2017) (non-waiver clause does not preclude oral waiver when supported by consideration).

143.    The waiver affects only past hourly proceeds, it does not operate prospectively as that would effectively amend the 2020 Agreement contrary to its provisions.

144.    PF has not proved that BF defaulted under clause 2(e)(i) by concealing case proceeds with regard to the *Silver Sands* and *Stubbs* cases, under clause 2(e)(iv) for failing to timely deposit case proceeds, or under clause 4 for improperly using its IOLTA and general accounts.

### e. Alleged breaches related to other litigation funding

145.    In its SOP, PF alleges seven defaults related to $70,000 that BF received from litigation funder Legalist in in connection with the *Department of Buildings Case*.

146.    The identified $70,000 in funds were provided to the client Tony Seiden and not to

BF, and the evidence did not show that the receipt of those funds impacted BF's interest in its fee

recovery.  PF did not prove how the receipt of the funds by the client constituted a default under

clause 2(e)(viii), clause 3, clause 15, or otherwise under the 2020 Agreement.

### f.  Liability of JB as Guarantor

147.    In its SOP, PF argues that JB is personally liable for BF's defaults under the 2020

Agreement pursuant to the Limited Guarantee Agreement.  (PSOP 17-18.)

148.    Under the guarantee, JB guarantees BF's "Recourse Obligations," which the 2020

Agreement defines as "all obligations of Law Firm under this Agreement as to which Law Firm

is fully liable and Pravati has recourse to all assets of Law Firm beyond just the Proceeds and the

Cases, but if, and only if, there occurs any Default under this Agreement."

149.    The guarantee applies to obligations for which BF is fully liable when there is a

default under the 2020 Agreement.

150.    The guarantee entitles Pravati, when BF fails to pay obligations upon a default, to

make a "Payment Demand" to JB that "shall be in writing and shall briefly specify what amount

[BF] has failed to pay and an explanation of why such payment is due, with a statement that

Pravati is calling upon Guarantor to pay under this Guarantee."

151.    The guarantee further provides that "A Payment Demand satisfying the foregoing

requirements shall be deemed sufficient notice to Guarantor that it must pay the Guaranteed

Obligations."  Moreover, "[a] single written demand shall be effective as to any specific failure to

pay during the continuance of such failure to pay . . . until such failure is cured."

152.    Under the 2020 Agreement, upon the occurrence of an event of default, the "Recourse Obligation" provision applies and interest accrues at the default rate.  As of June 22, 2021, BF was in default and thus liable for Recourse Obligations and default interest.

153.    The June 22, 2021 notice of default stated that the amount owed was $9,502,115.75 and demanded immediate payment.  The June 22, 2021 Demand to Guarantor sent concurrently to JB demanded immediate payment of the same amount.

154.    The June 22, 2021 Demand to Guarantor complied with the terms of the Guarantee by specifying the amount BF had failed to pay and why such payment was due (BF was in default). The Demand was effective even though it and the BF notice of default did not specifically identify the defaults related to *Reply All*, some of which were unknown to PF due to BF's failure to properly report on developments in the case.

155.    John G. Balestiere is liable under the Limited Guarantee Agreement for BF's contractual obligations related to BF's defaults and resulting breach of contract.

*B.2    PF's Claims for Fraud*

156.    In its SOP, JF alleges that BF committed fraud by inducing PF to fund millions of dollars for meritless cases, noting that it had a duty to disclose the *Counsel Financial* litigation, its "theft" of client funds in *Bernstein*, the lack of merit in *Reply All*, and ongoing malfeasance. (PSOP 18-22.)

157.    Claims of fraud must be proved by clear and convincing evidence.  *Klinger v. Hummel*, 11 Ariz. App. 356, 358 (1970).

158.    To prove fraudulent inducement, a plaintiff must prove: (1) a representation; (2) its

falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely on it; [and] (9) the hearer's consequent and proximate injury. *Duncan v. Pub. Storage, Inc.*, 253 Ariz. 15, 20-21 (App. 2022). A plaintiff alleging fraud by omission must show active, intentional concealment of a material fact by the defendant. *Gould v. M&I Marshall & Isley Bank*, 860 F. Supp. 2d 985, 989 (D. Ariz. 2012).

159.     PF has not proved by clear and convincing evidence that BF or JB committed fraud, by inducement or omission, with respect to the identified matters.

### B.3     PF's Claim for Breach of the Implied Covenant

160.     In its SOP, PF contends that BF "acted in bad faith throughout its relationship with Pravati," specifically noting that such bad faith started in 2018 when BF did not disclose it had "stolen" client funds in *Bernstein* and that BF acted in bad faith in the *Silver Sands* case by not paying PF its share of the $671,000 that BF received as an "escrow agent." (PSOP 22.)

161.     Arizona recognizes that there is an implied covenant of good faith and fair dealing in every contract. *Maleki v. Desert Palms Prof'l Props., L.L.C.*, 222 Ariz. 327, 333 (Ct. App. 2009). To establish a claim for breach of the implied covenant, the plaintiff must show that the defendant denied the plaintiff the "reasonably expected benefits of the agreement." *Nolan v. Starlight Pines Homeowner's Ass'n*, 216 Ariz. 482, 489 ¶ 27 (App. 2007).

162.     "The implied covenant of good faith and fair dealing is not a vehicle for creating contractual terms that the parties did not otherwise agree to; it protects the existing terms from

subversion." *11333 Inc. v. Certain Underwriters at Lloyd's, London*, 261 F. Supp. 3d 1003, 1024 (D. Ariz. 2017). A claim for breach of the implied covenant is not proper, and will be dismissed as duplicative, if it merely alleges breach of an express term in a contract. *First Fin. Bank, N.A. v. Claassen*, CV11-1728-PHX DGC, 2011 WL 5865013 *2 (D. Ariz. Nov. 22, 2011).

163. PF has not proved a breach of the implied covenant. Such a claim cannot be premised on alleged breaches of the express terms of the 2020 Agreement. PF has not shown that BF otherwise denied PF the reasonably expected benefits of the bargain, whether with regard to *Bernstein* and *Silver Sands* or otherwise.

### B.4    PF's Claim for Conversion

164. In its SOP, PF alleges that BF converted funds belonging to PF by not remitting fees earned in *Silver Springs*, *Stubb*, and in other matters. (PSOP 22-23.)

165. Conversion is a tort based on "any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Focal Point v. UHaul Co.*, 155 Ariz. 318, 319 (App. 1986).

166. PF has not proved that BF failed to pay proceeds from any contingent recovery. To the extent that BF recovered hourly fees in *Silver Springs*, *Stubb,* or other cases after September 2021, the Arbitrator concludes (see ¶¶ 140-43 above) that PF waived recovery of those fees.

167. PF has not proved conversion.

### B.5    PF's Claim for Unjust Enrichment

168. In its SOP, PF alleges, in the alternative, that BF was unjustly enriched by its receipt of $5,500,000 in loans from PF. (PSOP 23.)

169.    A claim for unjust enrichment requires proof of "five elements: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law." *Freeman v. Sorchych*, 226 Ariz. 242, 251, ¶ 27 (App. 2011).  The doctrine of unjust enrichment does not apply, however, if "there is a specific contract which governs the relationship of the parties." *Brooks v. Valley Nat. Bank*, 113 Ariz. 169, 174 (1976).

170.    PF is not entitled to recover for unjust enrichment because the 2020 Agreement governs the relationship between the parties.

*B.6.    PF's Damages*

171.    In its SOP, PF requests damages in the amount of $15,200,801.66, which reflects the $5,550,000 in funds loaned by Pravati, the $554,196.78 in payments from BF, with the last payment being received on September 7, 2021, and interest, including since the June 2021 notice of default, interest at the default rate, through December 5, 2023.  (PSOP 24.)

172.    PF also requests an award of punitive damages.  Under Arizona law, punitive damages requires proof that the party committing tortious conduct acted with an "evil mind."  "To establish an evil mind requires clear and convincing evidence that the defendant's actions either (1) intended to cause harm, (2) were motivated by spite, or (3) were outrageous, creating a substantial risk of tremendous harm to others." *Swift Transp. Co. of Arizona L.L.C. v. Carman in & for Cnty. of Yavapai*, 253 Ariz. 499, 506 ¶ 22 (Ariz. 2022) (internal quotation omitted).

173.    PF is not entitled to punitive damages.  It has not prevailed on its tort claims and it has not proved that BF or JB acted with the requisite evil mind to support an award for punitive

damages.

*B.7    BF's Affirmative Defenses*

174.    Apart from the claim of fraudulent inducement and the waiver of the right to proceeds from hourly fees, see ¶¶ 140-43 above, BF otherwise asserts several affirmative defenses.

175.    In its SOP, BF abandoned affirmative defenses based on bad faith, lack of reasonable care, consent, and excuse.  (BSOP 25 n.3.)

176.    Except as otherwise noted in this award, the Arbitrator concludes that BF has failed to prove the remaining affirmative defenses alleged by BF.

177.    BF broadly asserts that "Pravati has waived its right to all of its claims because it accepted the BF Parties' disclosures and other behavior without specific complaint, waiving any claim for further relief." (BSOP 26.)  BF has failed to show by clear and convincing evidence that Pravati "voluntarily and intentionally abandoned a known right." *Schultz v. Schultz*, 243 Ariz. 16, 19 (App. 2017).

178.    BF alleges "unclean hands" based on Pravati's alleged unethical conduct by promising funding it could not provide.  (BSOP 27.)  This claim fails because BF did not prove Pravati made the alleged false promise.

179.    BF also asserts that Pravati failed to mitigate any claimed damages because it had all the information available under the relevant agreements and it refused to entertain reasonable attempts to buy out its interests.  (BSOP 27.)  BF has not proved facts to support this defense as alleged.

180.    BF asserts that PF's claims are barred by the implied covenant of good faith and fair dealing.  (BSOP 26.)  Even assuming a breach of the implied covenant may serve as an affirmative defense, BF has failed to show a breach that would offer a defense to the claims by PF.  *See Yam Capital III, LLC v. Bailey*, 1 CA-CV 22-0283, 2023 WL 409692 ¶ 18 (App. Jan. 26, 2023).

181.    BF contends that PF's claims are barred because BF at all times acted in good faith. (BSOP 28.)  BF has not identified Arizona legal authority recognizing a generally applicable affirmative defense based on "good faith."  Nor has it adduced facts or developed arguments showing how such a defense would apply to particular claims made by PF.

182.    BF argues that PF's claims are barred because Pravati authorized and ratified all of BF's conduct .  (BSOP 29.)  Under Arizona law, ratification refers to an affirmance by a person of a prior act that did not bind him but will be given effect as if originally authorized by him. *United Bank v. Mesa N. O. Nelson Co., Inc.*, 121 Ariz. 438, 440 (1979).  "Ratification requires intent to ratify plus full knowledge of all the material facts." *Id.*

183.    BF has not proved ratification as an affirmative defense to any of PF's claims.

184.    BF argues that PF's material breaches by refusing to provide more funding and disclosing confidential information excused BF, as the nonbreaching party, from further performance.  (BSOP 28-29.)  *Zancanaro v. Cross*, 85 Ariz. 394, 400 (1959) (holding that victim of a minor or partial breach must continue own performance but victim of a material or total breach is excused from further performance); Restatement (Second) of Contracts § 242, cmt. a (Amer. L. Inst. 2011) (explaining non-breaching party's duty to perform suspended to allow breaching party to cure but stating that non-breaching party's duties to perform discharged if

material breach not capable of being cured or not cured within reasonable time).

185. BF did not prove a material breach related to PF's refusal to provide more funding or the disclosure of confidential information.

186. BF alleges as its final affirmative defense that Pravati is equitably estopped from asserting its claims because Pravati acted unethically. (BSOP 29.) Under Arizona law, the elements of the defense of estoppel are: (1) the party to be estopped commits acts inconsistent with a position it later adopts; (2) reliance by the other party; and (3) injury to the latter resulting from the former's repudiation of its prior conduct. *Gorman v Pima County*, 230 Ariz 506, 510 (Ariz. Ct. App. 2012).

187. BF has not proved estoppel such as to bar PF's claims.

C. *Claims by BF against PF or PC*

C.1. *BF's Claims for Breach of the 2019 or 2020 Agreement*

188. BF has not shown that PF or PC breached the 2019 Agreement before it was superseded by the 2020 Agreement.

189. In its SOP, BF alleges that Pravati breached the 2020 Agreement by failing to provide the promised funding and violating its confidentiality provisions. (BSOP 12-13.)

190. Pravati did not breach the 2020 Agreement by refusing to provide additional funding. BF has not proved that Pravati breached the confidentiality clause.

191. In its SOP, BF claims the alleged breaches caused the firm lost profits of at least $3,411,350.80. (BSOP 14.) Under Arizona law, a party seeking contract damages must prove them "with reasonable certainty." *See ChartOne, Inc. v. Bernini*, 207 Ariz. 162, 173 ¶ 39 (App.

2004) (*quoting Gilmore v. Cohen*, 95 Ariz. 34, 35 (1963) A damages award cannot be based on speculation. *Walter v. Simmons*, 169 Ariz. 229, 236 (App. 1991).

192. BF has not proved non-speculative damages related to the alleged breaches and its breach of contract claim also fails for that reason.

*C.2   BF's Claims for Breach of the Implied Covenant*

193. BF claims that Pravati breached the implied covenant by refusing to provide the promised funding and breaching the confidentiality provisions. (BSOP 13-14.)

194. Under Arizona law, a party generally cannot reasonably expect the other party to act other than in accordance with an agreement's express terms in order to protect its financial or business interests, so long as it does so for a legitimate business purpose. *See Southwest Savings & Loan Ass'n v. SunAmp Systems Inc.,* 172 Ariz. 553, 568 (App. 1992).

195. BF has not shown that Pravati denied it a reasonably anticipated benefit of the 2020 Agreement by refusing to provide additional funding or by breaching the non-confidentiality provisions. Pravati did not unreasonably or wrongfully exercise its discretion in declining to provide additional funding under the 2020 Agreement.

196. BF has not proved a breach of the implied covenant.

*C.3   BF's Claims for Unjust Enrichment*

197. In its SOP, BF alleges that PF and PC were unjustly enriched "by its false promise to the firm to provide further funding to the firm, including by way of entering into the 2020 Agreement which it could show to investors as another example of deployed or to be deployed capital."(BSOP 14.)

198.   BF has not proved a claim for unjust enrichment.  It did not prove a false promise by PF or PC to provide further funding in connection with 2020 Agreement.  Because that agreement governed the relationship between the parties with regard to additional funding, the doctrine of unjust enrichment does not apply.

### C.4    BF's Claim for Tortious Interference

199.   In its SOP, BF contends that PF and PC tortiously interfered with the firm's business relationships by; (a) not providing promised funding; (b) issuing an improper and financially and legally incorrect "default letter" which prevented the firm from obtaining other funding; (c) by issuing false "lien letters"; and (d) encouraging the firm to seek alternative financing and then refusing to proceed when BF presented multiple opportunities to refinance.  (BSOP 16-17.)   BF contends that it was damaged in terms of lost profits in an amount of at least $3,411,350.80.

200.   To prevail on a claim of tortious interference, a plaintiff must prove, by a preponderance of the evidence, each of these five elements: "[1] the existence of a valid contractual relationship or business expectancy; [2] the interferer's knowledge of the relationship or expectancy; [3] intentional interference inducing or causing a breach or termination of the relationship or expectancy; [4] and resultant damage to the party whose relationship or expectancy has been disrupted. . . . In addition, [5] the interference must be improper as to motive or means". *Neonatology Assocs. v. Phoenix Perinatal Assocs.*, 216 Ariz. 185, 188 ¶ 7 (App. 2007).

201.   BF has not proved its claim for tortious interference because it has not shown that it had a prospective business relationship "evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not

interfered*." Dube v. Likins,* 216 Ariz. 406, 414 ¶ 19 (App. 2007).  Nor has it show that PF or PC had knowledge of any particular contract or business relationship.  *See Neontology Assocs.*, 216 Ariz. at 188 ¶ 7.

202.   Nor has it proved that Pravati's alleged actions, including the sending of the lien letters, were improper as to their motives or means.

203.   BF also has not proved lost profits with the requisite specificity required for their award under Arizona law.  *See Soilworks, LLC v. Midwest Indus. Supply Inc.,* 575 F. Supp. 2d 1118, 1128 (D. Ariz. 2008*) (*recognizing that speculative damages that cannot be established with reasonable certainty are not recoverable):

204.   In the 2020 Agreement BF waived any liability by PF or its affiliates (which include PC) for special, indirect, consequential, punitive, or non-foreseeable damages.

205.   BF has not proved its claim for tortious interference.

*C.5     BF's Claim for Punitive Damages*

206.   BF requests an award of punitive damages in connection with its claims for tortious interference and fraudulent inducement.  (BSOP 18, 22.)

207.   BF PF is not entitled to punitive damages.  It has not prevailed on its tort claims and it has not proved that PF or PC acted with the requisite evil mind to support an award for punitive damages.

*D.     Award of Attorney's Fees, Costs and Post-Judgment Interest*

208.   Each side has requested an award of attorney's fees and costs. BF did so in its answer and counterclaim and again in its statement of position; PF did so in its arbitration demand,

which was incorporated by reference in its statement of position.

209.    Clause 18(f) of the 2020 Agreement states that "[t]he arbitrator shall have the authority to assess liability for pre-award and post-award interest on the claims, attorneys' fees, expert witness fees and all other expenses of arbitration as such arbitrator shall deem appropriate based on the outcome of the claims arbitrated."  In contrast, clause 18(h) and clause 24 each have language suggesting that the prevailing party in the arbitration shall be entitled to recover attorney's fees and costs.

210.    Based on the language in the 2020 Agreement and the outcome of the claims arbitrated (and considering that Pravati did not prevail on several prehearing motions), the Arbitrator concludes that: (1) Pravati is entitled to an award of reasonable attorney's fees but only for those fees incurred with regard to the pre- and post-hearing briefing and the preparation for and conduct of the evidentiary hearing; (2) each side shall bear its own costs related to the arbitration; and (3) each side shall bear its own filing and administrative fees related to the American Arbitration Association and each side shall pay half the Arbitrator's fees.

211.    The Arbitrator concludes Pravati Investment Fund IV, LLC is entitled to post-award interest at the rate stated in A.R.S. § 44-1201(B).  Because the 2020 Agreement does not itself specify a post-judgment interest rate, the interest on the award shall "be at the lesser of ten per cent per annum or at a rate per annum that is equal to one per cent plus the prime rate as published by the board of governors of the federal reserve system in statistical release H.15 or any publication that may supersede it on the date that the [award] is entered."  For purposes of the final award, the "prime rate" will be the prime bank rate as stated at: Federal Reserve

Board - H.15 - Selected Interest Rates (Daily) - February 16, 2024.

212.     On February 27, 2024, Pravati advised that it was forgoing an application for an award of attorney's fees.

213.     Consistent with the interim award dated February 21, 2024, Pravati Investment Fund IV, LP on February 27, 2024, submitted a detailed calculation of the interest and default interest accrued since June 22, 2021, with appropriate adjustments for amounts paid by BF after June 22, 2021, to identify the total amount due as of February 28, 2024, and the interest accruing daily thereafter.   The total amount due is $16,133,601.33 as of February 28, 2024, with interest accruing daily thereafter in the amount of $2,470.45.

Based on the foregoing findings of fact and conclusions of law, IT IS ORDERED:

(1)     the 2020 Agreement is enforceable and remains in effect;

(2)     Balestriere PLLC committed multiple defaults under the 2020 Agreement beginning in April 2021;

(3)     Based on the defaults, Pravati Investment Fund IV, LP is awarded damages for breach of contract in the amount of $16,153,364.93;

(4)     Pravati Investment Fund IV, LP is  awarded post-award interest at the rate of 9.5% per annum (bank prime rate plus 1%), which is a monthly post-award rate of .7917%.  The total post-award interest accruing daily after March 7, 2024, is $2,407.45;

(5)     The damages and post-award interest awarded to Pravati Investment Fund IV, LP are Recourse Obligations under the 2020 Agreement for which John G. Balestriere is liable as the Guarantor under the Limited Guarantee Agreement;

(7)     Pravati Investment Fund IV, LP has not proved and shall take nothing on its claims other than for breach of contract;

(8)     Balestriere PLLC has not proved and shall take nothing on its counterclaims against Pravati Investment Fund IV, LP and Pravati Capital LLC;

(9)     The administrative fees and expenses of the American Arbitration Association totaling $47,608.35 shall be borne as incurred, and the compensation and expenses of the Arbitrator totaling $76,125 shall be borne equally;

(10)    Each side shall bear its own attorney's fees and costs.; and,

(11)    As provided in the Term Sheet incorporated in the 2020 Agreement, this arbitration, including this award, is confidential.  No disclosure of the award shall be made by the parties except as required by law or as necessary to effectuate the terms thereof, including seeking entry of judgment on the Arbitrator's final award in any court having jurisdiction.

This AWARD is in full settlement of all claims and counterclaims submitted to this arbitration.

_Scott Bales_

_____
Scott Bales, Arbitrator
DATED: March 7, 2024